# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BIG HUNT MEDIA, INC., an Oklahoma Corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. CIV-18-299-R |
| SMITH & WESSON CORP., a Delaware Corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

## ORDER

Before the Court is Defendant's Motion to Dismiss, Doc. 6. Plaintiff Big Hunt entered into a contract for the 2016 hunting season with Defendant Smith & Wesson ("S&W"), a "well-known firearms manufacturer," to produce television shows, commercials, and other content featuring S&W products. Doc. 1-1, at 2. That contract expired on January 31, 2017, and Defendant notified Plaintiff on February 13, 2017 that it did not intend to renew. However, by then Plaintiff had already "completed the bulk of its filming for the [2017] season." Doc. 1-1, at 3. Plaintiff sued Defendant to recover for these services under two alternate theories: 1) breach of contract—alleging that the parties incorporated into their contract an auto-renewal provision of their Copyright License and Release, and 2) quantum meruit—alleging that Plaintiff rendered valuable services outside the contract's scope with a reasonable expectation of compensation. The Court hereby dismisses the breach of contract claim based on the expired contract and finds that Plaintiff alleges a plausible quantum meruit claim to recover for its 2017 production services.

1

## I. Background

There are three documents to consider in this case—(1) the "Television Advertising and Sponsorship Agreement," which provides that S&W pays Big Hunt $67,500 for content promoting S&W on various media during the term of January 1, 2016 through January 31, 2017, Doc. 6-1, at 1–4; (2) the Agreement's expressly incorporated "Terms and Conditions,"[1] *id.* at 5–6; and (3) the "Copyright License and Release," also referred to as "EXHIBIT A to Television Advertising and Sponsorship Agreement," which grants S&W intellectual property rights in the content produced under the Television Advertising and Sponsorship Agreement; the License also provides that "the Term will automatically renew" for another year "unless a party provides the other parties with written notice of non-renewal at least thirty (30) days prior to expiration" of the term. *Id.* at 7–9.

Plaintiff includes the Television Advertising and Sponsorship Agreement and Copyright License and Release in its complaint, but omits the Terms and Conditions. Doc. 1-1, at 7–13. Nonetheless, the Court considers all three documents to determine whether the Agreement automatically renewed for a year and whether it was reasonable for Plaintiff to expect compensation for the production of 2017 content without a new contract.[2]

---

[1] The Court analyzes separately the Television Advertising and Sponsorship Agreement from the Terms and Conditions—even though it is undisputed that the Agreement expressly incorporates the Terms and Conditions, Doc. 7, at 13—strictly to show the difference between the Agreement's incorporation language referring to the Terms and Conditions and the Agreement's non-incorporating references to the Copyright License and Release. *See infra* Part II(A) at 6.

[2] The Court can consider a document outside the complaint in a Rule 12(b)(6) motion without converting it to a summary judgment motion if the document is (1) "referred to in the complaint," (2) "central to . . . [P]laintiff's claim," and (3) "indisputably authentic." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Each of those factors is present with respect to the Terms and Conditions. Doc. 6-1, at 5–6. First, the complaint refers repeatedly to "the contract" or the "Agreement" that "is subject to and governed by the Terms and Conditions attached hereto and incorporated herein by reference." Doc. 1-1, at 3–4, 7. Second, determination of Plaintiff's claims requires the Court to interpret

## II. Discussion

Before turning to the merits of Plaintiff's two claims, the Court must first address jurisdiction and the governing law. Defendant removed this suit from the District Court of Cleveland County, Oklahoma, on the basis of diversity jurisdiction. Doc. 1. The removal application and petition offer a conclusory statement that the amount in controversy exceeds $75,000, even though the underlying contract at issue is for $67,500 and Plaintiff only alleges that it provided a fraction of these services for the 2017 season. Doc. 1, at 3; Doc. 1-1, at 3–5. However, Oklahoma allows for the recovery of attorney's fees in civil actions "for labor or services rendered," 12 O.S. § 936, and "statutorily allowed attorney fees may be considered in determining the amount in controversy." *Humphreys v. Fuselier*, 124 F.3d 216 (10th Cir. 1997) (unpublished) (citing *Missouri State Life Ins. Co. v. Jones,* 290 U.S. 199, 202 n.3 (1933)); *see also Francis v. Allstate Ins. Co.*, 709 F.3d 362, 368 (4th Cir. 2013). Thus, the Court finds that Defendant has made "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014); *see also McPhail v. Deere & Co.*, 529 F.3d 947, 953 (10th Cir. 2008).

Oklahoma choice-of-law principles treat Plaintiff's two claims differently. Massachusetts law governs Plaintiff's breach of contract claim because the Agreement and License both contain Massachusetts "Governing Law" provisions. Doc. 6-1, at 6, 8. *Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1033–34 (Okla. 2006).[3]

---

various provisions in the Terms and Conditions. Third, not only does neither party dispute the document's authenticity, but they rely extensively on the Terms and Conditions for their arguments.

[3] When the Court inquired into this "Governing Law" provision at the July 26, 2018 hearing, Plaintiff argued

The quantum meruit action, by contrast, is governed by Oklahoma law because it does not arise expressly from these contracts, but from an *implied* contract based on the parties' conduct. *See Klebe v. United States*, 263 U.S. 188, 192 (1923). "Oklahoma conflict-of-law principles apply . . . [f]or [Plaintiff's] implied contract claim[]" and "dictate that *lex loci contractus* controls—i.e., 'the nature, validity, and interpretation of a contract are governed by the law where the contract was made.'" *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1178 (10th Cir. 2009) (quoting *Harvell*, 164 P.3d at 1034). For an implied contract like this, Oklahoma law considers the contract to have been made "where the services were rendered." *Harvell*, 164 P.3d at 1036.[4] Plaintiff rendered the services at issue, production for the 2017 season, in Oklahoma. Doc. 1-1, at 1. At the Court's July 26, 2018 hearing, neither party suggested that Massachusetts or Oklahoma law would dictate a different result in this case.

**A. Breach of Contract**

Plaintiff fails to allege a plausible breach of contract claim because—to state the obvious—[t]o prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties." *Bulwer v. Mount Auburn Hosp.*, 473 Mass., 46 N.E. 3d 24, 39 (Mass. 2016). The parties agreed to a Television Advertising and Sponsorship Agreement for the 2016 "Broadcast Season/Term," with terms running from January 1, 2016 through January 31, 2017. Doc. 6-1, at 1. Plaintiff does not allege that Defendant failed to

---

that Defendant waived application of Massachusetts law by not asserting it in its Motion to Dismiss briefing. The Court disagrees that waiver is appropriate at this early stage, and it would directly contradict the terms of the contract. *See* Doc. 6-1, at 6 ("No Waiver . . . .").

[4] The *Harvell* court confronted an unjust enrichment claim, but Oklahoma courts view quantum meruit as a closely related theory of recovery. *See I.P.I.C., GSP, S.L. v. Ruhrpumpen, Inc.*, No. 08-CV-0510-CVE-PJC, 2009 WL 5101761, at *4 & n.15 (N.D. Okla. Dec. 17, 2009); *Miller v. Miller*, 956 P.2d 887, 904 (Okla. 1998); *Am. Automated Theatres, Inc. v. Hudgins, Thompson, Ball & Assocs., Inc.*, 516 P.2d 565, 568 (Okla. Civ. App. 1973) (Brightmire, P.J. concurring).

4

meet its obligations during this term; it instead claims that Defendant failed to make payments for the 2017 season, in which the parties lacked a formal contract. Doc. 1-1, at 3–4. Thus, by suing on an expired contract for services outside the contract's scope, Plaintiff cannot meet an essential element of breach of contract.[5]

Plaintiff attempts to resurrect this claim by arguing that the Television Advertising and Sponsorship Agreement incorporated by reference the auto-renewal provision in their Copyright License and Release, and that the License "has no ascertainable purpose" if unincorporated. Doc. 7, at 11–12; *see* Doc. 1-1, at 4; Doc. 6-1, at 7 ("[T]he Term will automatically renew for additional successive twelve (12) month periods, unless a party provides the other parties with written notice of non-renewal at least thirty (30) days prior to expiration of the then-current twelve (12) month Term."). To incorporate by reference, "the document to be incorporated [must] be referred to and described in the contract so that the referenced document may be identified beyond doubt." *Lowney v. Genrad, Inc.*, 925 F. Supp. 40, 47 (D. Mass. 1995)). The language used "to incorporate extrinsic material by reference . . . must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *NSTAR Elec. Co. v. Dep't of Pub. Utilities*, 968 N.E. 2d 895, 905–06 (Mass. 2012) (quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008)). When "language [is] ambiguous," the Court "consider[s] it in light of the

---

[5] Although the Court is highly skeptical of Plaintiff's unconscionability argument, the Court sees no need to address it because the argument rests on Defendant's reading of the Agreement's immaterial cancellation provision. Doc. 7, at 15–16.

'contract as a whole, in a reasonable and practical way.'" *Id.* (quoting *MCI WorldCom Communications, Inc. v. Dep't of Telecomm & Energy*, 810 N.W. 2d 802 (Mass. 2004)).

The Television Advertising and Sponsorship Agreement only incorporates the Terms and Conditions, *not* the Copyright License and Release. There are at least five textual reasons: (1) the Agreement expressly "incorporate[s] herein by reference" the "Terms and Conditions," whereas the Agreement merely refers to the Copyright License and Release by stating "See Exhibit 'A'" and "Producer shall . . . obtain and provide to S&W executed copy(ies) of the Copyright License and Release, in the form attached hereto as Exhibit A . . . ." Doc. 6-1, at 2–3; (2) the bottom of each page of the Terms and Conditions states "Smith & Wesson Terms and Conditions Television Advertising and Sponsorship Agreement," whereas the License pages only read "Copyright License and Release," *id.* at 5–9; (3) the Terms and Conditions and Copyright License and Release each repeat entire sections, meaning that the parties did not intend to automatically apply the Terms and Conditions' sections to the License, *id.*; (4) the License's auto-renewal section refers to "a *party* provid[ing] the other *parties* with written notice," meaning there are at least three parties to that contract, whereas the Television Advertising and Sponsorship Agreement clearly has only two parties, *id.* at 4, 7, 9 (emphasis added); (5) the phrase "This Agreement" in the License's auto-renewal section refers to "This Copyright License and Release (the 'Agreement')." *Id.* at 7.

Plaintiff's purpose-driven argument fairs no better. Doc. 7, at 11–12. The Copyright License and Release maintained an "ascertainable purpose" when it automatically renewed in spite of the Agreement's expiration—it provided Defendant continued intellectual

property rights in the content that Plaintiff already produced, meaning that S&W could reproduce 2016 content even if Big Hunt stopped making new shows and commercials. *See* Doc. 6-1, at 7–9. It is actually the Television Advertising and Sponsorship Agreement that would have no purpose if it out-lasted the Copyright License and Release because then S&W would be left with essentially valueless content that it could not use. This likely explains why the License automatically renewed, whereas the Agreement did not.

Thus, the auto-renewal provision is restricted to the Copyright License and Release, the Television Advertising and Sponsorship Agreement expired on January 31, 2017, and Plaintiff fails to allege a plausible breach of contract.

**B. Quantum Meruit**

Despite the parties' express contract for the 2016 hunting season, Plaintiff alleges a plausible claim for quantum meruit. The claim has three elements: "(1) Plaintiff rendered valuable services to Defendant with a reasonable expectation of being compensated, (2) Defendant knowingly accepted the benefit of the services, and (3) Defendant would be unfairly benefited by the services if no compensation were paid to Plaintiff." No 23.10, OUJI-CIV92d; *see also BB & B Const., Inc. v. Hogan*, 17 F. App'x 850, 851 (10th Cir. 2001) (unpublished).

Regarding the first element, Plaintiff completed the bulk of filming for the 2017 hunting season—"producing footage that featured and promoted Smith & Wesson products"—and expected to be compensated based on the parties' "longstanding" course of dealing and the industry standard for television production. Doc. 1-1, at 2–3. ("Both parties anticipated an ongoing relationship . . . . Television production requires filming long before

7

a program airs."). It was typical that even by late 2016, Defendant had yet to provide notice of renewal, as "the parties did not formalize their contract" the last time around until "five months after performance obligations accrued." *Id.* at 2. The reasonable value of this footage for the 2017 hunting season is unclear—after all, Defendant represented at the Court's hearing that it has no intention of airing it, and the parties no longer have a contractual relationship.[6] Nonetheless, the Court sees no reason why the services would not retain at least *some* value. *See BB & B*, 17 F. App'x at 851–52 (quoting *Reynolds v. Conner*, 123 P.2d 664, 668 (Okla. 1941)) ("evidence of the express contract can be admitted 'as a circumstance indicating' the 'value of the services' rendered by the plaintiff to the defendant"); Restatement (Third) of Restitution and Unjust Enrichment § 38 (Am. Law Inst. 2011).

Defendant reasonably argues that Plaintiff should not have expected compensation for production expenses because that "directly contradict[s] the express intent of the parties" through their Television Advertising and Sponsorship Agreement. Doc. 6, at 10. This tracks the common-sense principle for implied contracts that the Court will not imply a contract when an express one applies. *See McCurdy Group v. Am. Bimedical Group*, Inc., 9 Fed. App'x 822, 827 (10th Cir. 2001) (unpublished); *Martin v. Buckman*, 883 P.2d 185, 194 (Okla. Civ. App. 1994) ("[T]he quantum meruit concept ordinarily is not applicable if a contract specifies the quantum to be paid by the recipient of the contract services."). In

---

[6] The petition also does not clarify whether Plaintiff actually delivered this 2017 footage "to Defendant." No. 23.10, OUJI-CIV; *see* Doc. 1-1, at 5 ("Smith & Wesson knowingly accepted Big Hunt's services, involving the production of footage that featured and promoted Smith & Wesson products."). "[V]iewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the non-moving party," the Court finds that Plaintiff rendered valuable services to Defendant. *MacArthur v. San Juan County,* 497 F.3d 1057, 1064 (10th Cir. 2007).

particular, Defendant points to three provisions in the Agreement that it believes bars compensation of Plaintiff's production expenses for the 2017 season: (1) that S&W objects to any different, additional, or inconsistent terms "set forth in any communication . . . or which otherwise would be deemed established by any course of dealing or custom in the trade," and those terms "will not be binding upon S&W"; (2) "S&W reserves the right to modify, reject, cancel or stop any and all Deliverables by providing notice to Producer"; and (3) "producer shall . . . be responsible for payment of all costs and expenses associated with producing and broadcasting the Television Program." Doc. 6-1, at 5.

The Court finds Plaintiff's work on the 2017 hunting season "outside the scope of the express contract." *McCurdy*, 9 Fed. App'x at 827. While Plaintiff began working on the 2017 season during the term of the Agreement, it did not attempt to establish "different, additional, or inconsistent terms" to *this* Agreement. Doc. 6-1, at 5. Nor was it providing "Deliverables," which are most logically construed as services for the 2016 hunting season. *Id.* Instead, it was anticipating an entirely new contract between the parties for the 2017 season that never came to fruition. Granted, the Agreement left Plaintiff responsible for production costs, but that Agreement was expressly limited to the "Broadcast Season/Term" of "July 1, 2016 through December 31, 2016." *Id.* at 1. Thus, the parties' express contract does not bar Plaintiff's reasonable expectation of compensation.

As to the second element for quantum meruit, Defendant knowingly accepted the benefit of Plaintiff's services. "Big Hunt communicated with Smith & Wesson throughout production—asking for Smith & Wesson products to feature on the show and highlighting how Big Hunt was promoting Smith & Wesson products in filming, online, and through

9

other mediums." Doc. 1-1, at 5. Some of these services appear to be "Deliverables" owed under the Agreement for 2016. Yet, the filming for the 2017 season was beyond the Agreement's scope and Defendant still accepted these services, waiting until February 13, 2017 to provide notice of nonrenewal. *Id.*

Moving finally to the fairness element, the equities surely favor Plaintiff. Defendant's conduct may have been permissible under the parties' express contract, but that does not make it fair. Defendant allegedly acquiesced to Plaintiff's accumulating production expenses despite having no intention of renewing the Agreement or reimbursing Plaintiff. Therefore, Plaintiff alleges a plausible claim for quantum meruit.

### III. Conclusion

The Motion to Dismiss (Doc. 6) is GRANTED IN PART with respect to Plaintiff's breach of contract claim and DENIED IN PART with respect to Plaintiff's quantum meruit claim.

IT IS SO ORDERED this 30th day of July 2018.

_____
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE